# UNITED STATES COURT OF APPEALS

# FOR THE FOURTH CIRCUIT

In re: Tavon Dameon Davis               {

                                 {        Case: 1:11-cr-00657-MJG-1 (District)

                                 {        Judge: Marvin J. Garbis

                                 {

                                 {        **MOTION FOR LEAVE TO FILE PETITION**

                                 {        **FOR EXTRAORDINARY WRIT OF ERROR**

                                 {        **APPARENT UPON FACE OF THE RECORD**

                                 {        **WITH AFTER-DISCOVERED EVIDENCE**

                                 {        **IN AFFIRMATION**

NOW COMES petitioner, TAVON DAMEON DAVIS, (hereinafter "petitioner" or "Davis"), filing in propria persona, respectfully moving this higher court of law for leave to file this petition for an Extraordinary Writ of Error.

This writ looms deductible by occurrences that have ensued since the petitioner's incarceration which commenced on January 28, 2013, conclusible by way of after discovered evidence, as a whole, that would have been admitted during his initial former legal proceedings, except for "prosecutorial misconduct".

Further, these facts judicially noted, distinguish "legal error" and/or misconduct that occurred in specificity during the incipient legal proceedings, all now supported by the affirmative evidence in presentment herewith.

Additionally, this means of proof becomes a burden of persuasion exemplifying a probabilistic and retrospective projection that the petitioner was wrongfully

TO

convicted and sentenced as he was. Re-sentencing at minimum is decretal as a matter of law under the new surrounding facts now in plain view.

There can subsist no question this uncontroverted evidence would have been admissible and would have devastated the government's case in 2012 in final judgment.

Regrettably, in full display, giving this Department of Justice yet another deserved "blackeye", this new body of facts brings to the forefront more corruption in the form of "prosecutorial misconduct" beyond comprehension, particularly in this instance, whereby it places the United States Attorney for the District of Maryland, in a distasteful role, that of a deceitful, dishonest professed minister of justice.

How can any accused offender anticipate justice will be served with these goings-on from ministerial officers in a diseased justice system, totally obsessed with the advancement of internal careers at the expense of gullible and unschooled "targets", many with racial implication, such being the case heretofore?

This writ of error persists as the most common of all forms of remedial process available to an unsuccessful party after a final determination of the merits of an action, and is in common use in this country at the present time, where the common law modes of procedure are followed.

Its object, as existing in the instant action, is to obtain a reversal of the final judgment in this criminal case issued by the lower court on December 4, 2012 by the Honorable Marvin J. Garbis.

His visible "legal errors" of fact affected the validity and regularity of the authoritative decision itself, with new proof now substantiating the truth, not from the tortuous government but from actual facts. This body of office holders is celebrated for its entitlement to "opinion", that does not include, however, its entitlement to adjusting "absolute certainty".

This case, if not prestidious before, now adopts a new contour, as it exposes the "foul play" and misconduct, not singularly of prosecutor John Francis Purcell, Jr., but it dishonors Rod J. Rosenstein, not only in his role as United States Attorney for the District of Maryland, but as someone, by his practice of law, advanced to become Deputy Attorney General of the United States.

This allegation persists in probative matter, apparent upon the face of the record from which the judgment now appears to have been concluded devoid of absolute certainty. (B.J. Shipman, "Handbook of Common-Law Pleading," Section 337 at 538, Henry Winthrop Ballantine Ed., 3rd Ed. 1923).

Validated by this formally suppressed body of facts, newly amenable testimony now reinforces admitted testimony. Four (4) errors in exactness are being cited to have negligently influenced the inaccurate sentencing, if not conviction, of the petitioner, all central to the after-discovered evidence in appearance as Exhibit "A". These errors, from the face of the record appear as follows:

1. District Court unknowingly was subjected to blatant "prosecutorial misconduct" resulting in "legal error", unimaginably orchestrated by then United States Attorney for the District of Maryland, (who later became Deputy Attorney General of the United States), Rod J. Rosenstein.

2. District Court committed "legal error" and/or "judicial misconduct" when it failed to "legalize" the elements of three (3) terms, "deliberate elicitation", "witness", and "interstate".

3. District court failed to ascribe to petitioner's "minor role" in this murder-for-hire conspiracy, yet persisted throughout the legal proceedings to make statements of skepticism that he was wrongfully accused, now validated with certitude pursuant to after-discovered evidence.

4. District court erred when it accepted the discriminatory terms of a plea agreement so one-sided it looms as an imaginative faculty with the declaratory demeanor of substantial cooperation going unrewarded.

Regrettably, foul play by the government must not be discarded. This 35-year sentence to the petitioner is not only ludicrous, it reeks with government racial overtones composed and methodized by the now infamous Mr. Rosenstein, a pillar of justice all of America now holds entitlement to scrutinize, specific to this debacle of injustice.

A fortiori, the results in this travesty must persist as a crude distortion of fairmindedness. With this rational logicalness, this appellate court must review these improprieties for "abuse of discretion", and exercise its authoritative powers to reverse the draconian sentence, if not conviction, invoked upon the petitioner, as racial injustice.

**Right to Appeal**

The petitioner remains cognizant of the fact his conviction from his guilty plea does not grant him an automatic right to appeal. Notwithstanding, the after-discovered evidence must negate that plea, as it was central to "prosecutorial misconduct". Additionally, "legal error" is a founded ground for appeal in a criminal case.

In the case at bench, "legal error" resulted by way of the suppression of evidence by the prosecution which visibly affected the outcome of the case, now supported by the after-discovered evidence in appearance herein as Exhibit "A."

With credence, the petitioner realizes discretion by the court prevails in reopening any segment of a closed case. In justification, however, he directs the court to Exhibit "A," which singularly in toto affirms his allowance. (See Burk v State, 497 So. 2d 731, 733 –Fla 2d DCA – 1986) (citing United States v Walker, 772 F. 2d, 1172, 117 – 5th Cir – 1985).

Notwithstanding, the petitioner provides reasonable explanation to justify his right to appeal. In truth, the "prosecutorial misconduct" and "legal errors" in isolation, mandate invalidation of this conviction, with the cornerstone in argument looming as the government, not only fabricated a story to protect a licensed attorney, but that deceit was orchestrated by then United States Attorney, District of Maryland, Rod J. Rosenstein, who later became Deputy Attorney General for the Department of Justice (DOJ).

In furtherance, the reopening of this case is mandated because, had the after-discovered evidence been presented, as it could have, at the initial legal proceedings, it would have held a significant impact on all the issues in determination of guilt and sentencing at that moment in time.

The after-discovered evidence (Exhibit "A"), must encourage this higher court to remand this case for resentencing, if not in fact, vacate the final judgment of Tavon Dameon Davis, filed on December 4, 2012. This looms with material evidence that "cuts to the heart of the matter", as it is not merely cumulative or impeaching.

TD

## Pro Se Filing

In furtherance, courts have held pro se litigants to less stringent standards than formal pleadings drafted by lawyers (Erickson v Pardus, 551 U.S. 89, 94, 127 S. Ct. 2197 – 2007). This court is charged with liberally construing this pleading filed by a pro se litigant to allow for the development of a potentially meritorious claim (Boag v MacDougall, 454 US 364, 365 – 1982). The petitioner proceeds in the spirit of this understanding.

## In Forma Pauperis

Additionally, the petitioner requests leave to proceed in forma pauperis, affirming under penalty of perjury that, because of his poverty, he cannot pay any filing or docket fees pursuant to 28 U.S.C. {} 1746 and 18 U.S.C 1621.

## Criminal Case Background

On December 3, 2012, the court sentenced Defendant Tavon Dameon Davis to 420 months (35 years) to the custody of the Bureau of Prisons (BOP) for his violation of 18 U.S.C. {} 1958(a), conspiracy to use interstate communication facilities in the commission of murder-for-hire, and 18 U.S.C. {} 1512(a)(1)(C), (3)(A) and (k), conspiracy to murder a witness resulting in death. This decree of punishment is to be followed by five (5) years of supervised release.

Sentence disparity is certainly forewarned in this unreasonable disciplinary punishment, now convincingly present pursuant to after-discovered evidence.

Co-defendant Frank Marfo, by his own elective performance, paid co-defendant Bruce Eric Byrd $2,000 to kill 19-year-old, Isaiah Cortez Callaway. For his direct participation in this criminality, he received a life sentence. Byrd, the actual "shooter" received 40 years, while a "cooperating" Copeland (the fourth co-defendant),

instantly turned informant, realized immunity, and justice "holds its head high" in balance and impartiality. The four co-defendants, plus Callaway, were under investigation for conspiracy in a bank fraud scheme.

Nothing could be more out of balance, as the after-discovered evidence now in presentment herein shatters the veil of deceit of prosecutor Purcell, Mr. Rosenstein, and even the presence of defense counsel Paul D. Hazlehurst, soon to be recognized for what he was in this racial travesty, a puppet in collusion with the government. This is not a speculative allegation, as this higher court is soon to be enlightened, but a statement of fact.

The 25-year-old Davis was sentenced to 35-years in prison for all the wrong reasons, as attorney Larry J. Feldman, the mastermind of the murder-for-hire plot still roams the streets of Maryland practicing law. Purcell boosted his career status with blatant misconduct, and the now infamous Mr. Rosenstein, having served as U.S. Attorney for the State of Maryland and U.S. Deputy Attorney General of the United States, is practicing law independently, carefree of his cheating ways in this singular matter for judgment, which immediately causes one to question, how many other cases did Purcell and Rosenstein similarly prosecute under the pretext of justice?

**Error Number One: District Court unknowingly was subjected to "prosecutorial misconduct" resulting in "legal error", unimaginably orchestrated by then United States Attorney for the District of Maryland, who later became U.S. Deputy Attorney General of the United States, Rod. J. Rosenstein.**

"Good Samaritan" action is defined as "A deed performed gratuitously by a person to help another person who is in peril." (Black's Law Dic., Deluxe 11th Ed. at 838).

This honorable court is introduced to Mr. Daniel Scott, a "good samaritan" from the state of Maryland, who has stepped forward of his own accord with first-hand evi-

dence garnered directly from attorney, Larry J. Feldman, void any solicitation of any kind.

In 2015, while Feldman and Scott were attending organizational meetings of Sex Addicts Anonymous (SAA), Feldman coincidentally befriended Scott to a point he used him as a "confessional" to clear his conscience, which is part of the 12-Step Program advocated by the SAA.

By circumstance, this series of confessions are related to the instant action, and Mr. Scott has stepped forward in his own words, "I believe in the rule of law and the punishment invoked on Tavon Dameon Davis is the direct result of police and prosecutorial misconduct."

While Mr. Scott attempted to present this information directly to law enforcement, it expressed no interest. Of course not, it wasn't about to involve itself in what lies ahead for Purcell and Rosenstein. Therefore, that unsolicited factual data now appears in Exhibits "A" and "B," primary in the form of an affidavit/declaration, allowable under state and federal law. Should this court for any reason play the game of procedural default, this information will be released to the media.

Exhibit "B" is the introductory letter Scott wrote to the imprisoned Davis early in 2020. This in turn led to a telephone call to Davis' wife, Towanda Riley, which concluded with the testimony now in appearance for this higher court's edification and perusal.

The cornerstone of this appeal is the fact Davis experienced an ineffectual attempt at justice, gone awry because of "double-dealing" by the government. This after-discovered evidence surfaces as Exhibit "A," eight years after the petitioner was inappropriately sentenced to 35-years in prison for his "minor" role in a murder-for-hire plot, masterminded by Larry J. Feldman (mens rea) and executed by "hitman" Bruce Eric Boyd (actus reus). It was the petitioner who was solicited by Feldman to be the go-between Feldman and Boyd. In a murder-for-hire plot, only two elements prevail,

TO

those being who had the mental intent (mens rea), and who provided the "deed of crime" (actus reus). With these two actors identified, anyone else involved was far removed from consequential participation.

While this after-discovered evidence was readily available at the time of the legal proceedings, eight years prior, it never "saw daylight" because prosecutor John Purcell suppressed it in its entirety.

Feldman was never indicted or convicted for his mastermind (mens rea) role in this killing of 19-year-old, Isaiah Cortez Callaway, Feldman's client at the time.

This realization arose when United States Attorney for the State of Maryland, Rod J. Rosenstein, took it upon himself to negotiate a backhanded, illegal deal with Feldman, in return for his full cooperation to railroad Davis to prison for 35-years. (See Exbt. "A" at # 23, 24).

Rosenstein not only minimized Feldman's actual role in the murder-for-hire plot, he had the FBI fabricate a story to make it appear Feldman was a cooperating informant (id). With prosecutor Purcell in tow, fully apprised of the goings-on, Rosenstein made arrangements with the Attorney Grievance Commission of Maryland, as to how Feldman could be reprimanded, as part of the deal. (id at #31).

It was emphasized, Rosenstein and the FBI were to be "totally invisible" toward any wrongdoing. The term Rosenstein employed was, keep them "insulated". (id)

By outward appearance, the Attorney Grievance Commission of Maryland is avowedly a dedicated agency in place to protect the public while maintaining the "integrity" of the legal profession. More veiled deception in a masquerade of justice.

The Commission is sanctioned, through the Office of Bar Counsel, to seek, encourage and promote the ethical practice of law and the highest standards of professionalism by members of the bar, Feldman being a member at the time.

TD

**A CLOSER LOOK AT ROD J. ROSENSTEIN.**

This "pillar of justice" served as Maryland's United States Attorney from July 12, 2005 until April 25, 2017, when he resigned to become Deputy Attorney General for the Department of Justice, under then Attorney General, Jeff Sessions. Rosenstein resigned on April 29, 2019, with some apparent encouragement from President Trump.

At last sight, he was with the law firm of King & Spalding as a partner on the "Special Matters & Government Investigations" team. Certainly an exemplary career for someone with "skeletons in his closet".

This is the same Rosenstein who authored a memo that President Trump cited as the basis in his decision to dismiss FBI Director, James Comey. This is the same Rosenstein who reportedly told 5 U.S. attorneys in districts along the border of Mexico they were to disregard the ages of immigrant children when prosecuting their adult parents, which resulted in the separation of thousands of children from their loved ones. This is the same Rosenstein who appointed Robert Mueller as special counsel to investigate alleged ties between the Trump campaign and Russia during the 2016 election and other related matters. This is the same Rosenstein who made a deal in 2012 with Maryland attorney, Larry J. Feldman, the architect of a murder-for-hire plot of his then 19 year-old-client, Isaiah Cortez Callaway. Part of that deal was having the FBI fabricate a story which protected Feldman which resulted in a 35-year sentence for the African-American, 25 year old, Tavon Dameon Davis, with Rosenstein being certain he and the FBI were "insulated" from any wrongdoing.

## DUE PROCESS VIOLATION

The prosecution in any criminal case has a duty to disclose exculpatory evidence in its possession or control when that evidence may be material to the outcome of a matter for judgment. It is better recognized as Brady Material. A prosecutor's withholding of such information violates the defendant's due process rights. This is precisely what prosecutor Purcell accomplished in the instant action, evidenced throughout Exhibit "A." (See Brady v Maryland, 373 U.S. 83 S Ct., 1194 – 1963).

When Feldman was contacted by law enforcement officials, indicating they wanted to interview his client, Callaway, about the bank fraud scheme in question, Feldman seized the opportunity.

First, he called co-defendant Copeland, who at the time unbeknownst to anyone, had made his own deal with Purcell for immunity. Copeland not only provided Feldman with prostitutes on a regular basis, he was privy to his other active criminal dealings, which the government eventually came to realize.

The purpose of the call was to warn Copeland that Callaway was going to incriminate him, Davis, Marfo and Boyd when interviewed. Feldman added, that if convicted they will all get no less than 20 years, then suggesting Callaway had to be eliminated. It was then Copeland, the informant, influenced, Feldman to call Davis, and suggest he assist in finding a "hitman," which is what seemingly occurred.

It was this disclosure that Rosenstein used to work with the Attorney Grievance Commission to lighten Feldman's breach of the Rules of Professional Conduct, thereby diverting his actual role in Callaway's killing. The violation was informing Davis that prosecutors wanted to speak with his client, Callaway, in a criminal investigation of the fraud scheme. This remains all on the record.

Factually, Davis did exactly that. He alerted Copeland (still unaware of his informant role), Frank Marfo and Bruce Eric Boyd, relaying Feldman's message.

It was clear to Davis, Feldman had other reasons he wanted Callaway dead. Soon after that, Davis learned that Feldman lied about the 20-years if convicted for the bank fraud finding of guilt, noting it was more like three or four years at best. When Davis made this discovery, he further advised Marfo and Boyd that something wasn't right and it appeared this "hit" was a personal vendetta of Feldman to have Callaway eliminated, insisting they should forget the killing.

The record is clear, in a sealed sentencing transcript, constant rhetoric reveals Davis and Callaway consistently referred to each other as "brothers." Judge Garbis substantiated this with his statement, "He (Callaway) was converted from a more or less seemed-to-be bright young man, into a criminal, by virtue of his treating Mr. Davis as a "brother". (Sealed Sent. Tr. At 13, lines 17-24).

The only reason to seal this transcript was to camouflage it from public view, where if scrutinized by proper authoritative powers, it would reveal the complete miscarriage of justice that occurred in this legal proceeding. A 25-year-old, African-American was sacrificed to protect a licensed attorney, who by his own actions, must not only be disbarred from further practice, but he must now be indicted.

He has been illegally protected of his criminality by a prosecutor named John Purcell, who in turn protected a U.S. States Attorney named Rod J. Rosenstein, whose past performances,  deductible by this case alone, must be carefully scrutinized to determine just how damaging he has been with human lives during his "climb to the top", as deplorable as it is.

Davis never wanted his "black brother" killed. In the spirit of this "cultural" understanding, "black brothers" don't kill off each other without serious provocation.

This form of "culture is neither natural nor artificial, neither genetically transmitted nor rationally designed. It is a tradition of learnt rules of conduct which have never been invented and whose functions the acting individuals usually do not understand." (Friedrich A. Hayek, "Law, Legislation and Liberty", 154 – 1979).

TO

In this instance, Feldman provided that provocation with a fabricated lie, having his own reasons to personally want Callaway "out of the way". (Exbt. "A" at #13, 14).

To accomplish this, he put "fear and panic" into a "scared" Davis, who he also wanted to eliminate (id at #7).

Surely this judicial assembly can appreciate how an attorney with 18 years of legal experience, involved in his own criminal activity, can instill "fear and panic" into a naïve 25-year-old African-American. (id at #20).

Let this court be reminded it was Davis who paid Feldman $2,000, and several prostitutes, to legally represent Callaway when he was arrested for his alleged involvement in the bank fraud scheme.

Didn't anyone find it irregular that Feldman, once notified by law enforcement officials that they wanted to interview Callaway, his client at the time, instantly telephoned Davis? Of course Purcell and Rosenstein were well aware of this call and the reasoning behind it; the pair simply concealed its importance as they committed "destruction of evidence".

Further, Feldman perjured himself with Maryland's Attorney Grievance Commission, when he opined, "I had no idea Davis was a suspect in the check fraud scheme" and "In a million years, I never thought anything would lead to Isaiah's death." ("The Baltimore Sun", 2011) (Exbt. "A" at #17).


The attempt by Davis to denounce his personal involvement by strongly suggesting Marfo and Boyd forget the "hit", qualifies as repentance and affects his liability because it occurred before the overt act was committed,.

Davis didn't have to hire anyone as a "hitman" at the insistence of Feldman. Both Marfo and Boyd realized if Callaway incriminated them, as Feldman initially conveyed, they could each face 20+ years in prison for the fraud conviction. Absent any

encouragement from Davis, Marfo offered to pay Boyd $2,000 to be the "hitman" in the murder-for-hire scheme. Boyd agreed, money exchanged hands, and Feldman was so informed, again insisting the "hit" take place before Callaway is interviewed.

As this court now knows, Feldman was involved in far more illegal activity than simple prostitution. (id at #10)

It's believed Feldman wanted Callaway killed because he became aware of some of Feldman's other illegal dealings (id at #27), and Feldman feared he might disclose those as well, when interviewed, to get himself a better deal with the government.

### Error Number Two: District Court committed "legal error" and/or "judicial misconduct" when it failed to legalize the elements of three(3) terms, "deliberate elicitation", "witness" and "interstate".

The actualization that the 25-year-old naïve petitioner, at the insistence of his in-effective counsel of record, Paul Hazlehurst, pled guilty to Counts 1s and 3s of a superseding indictment, no longer carries its previous weight. Not only was Hazle-hurst ineffective, he was "forced upon" the petitioner in representation by the mis-conduct-minded prosecutor, John Purcell. Conjoin this occurrence with the added fact that both counts were fatally defective, resulting in a complete miscarriage of justice.

#### Hobson's Choice Proves Collusion and Counsel Ineffectiveness

For matter of significance in the case at bar, yet covertly absent from the record, this higher court is now directed to the particulars that follow.

On July 3, 2011, Davis was summoned to an interview standardized by the Baltimore City Homicide Detectives Agency. Wisely, he was accompanied by counsel, in the person of Ms. Catherine Flynn, a partner at the law firm of Margaret Mead, who can be subpoenaed if necessary.

TD

Once there, he was asked basic questions pertaining to the killing of Isaiah Cortez Callaway, and disclosed nothing. He was dismissed without incident.

In another unrelated happening, Mrs. Ronnica Watson, an acquaintance of Davis, violated her probation and faced revocation of same. As he did for Callaway, Davis retained the legal services of Feldman to represent her. The record, now supported by after-discovered evidence, discloses both Copeland and Davis provided Feldman with prostitutes. (id at #7)

For reasons never made clear, at her revocation hearing, Feldman entered her plea of guilty without her knowledge or permission. As the record discloses, this was never explained or challenged.

Then, soon thereafter Mrs Watson was surprisingly summoned with Davis's wife, Towanda Riley, to appear before the grand jury by way of subpoena.

Subsequently, Davis was "picked-up" and escorted to the downtown Baltimore Federal Building, where he was confronted by AUSA, John Francis Purcell, Jr. and co-defendant Michael Copeland. It was at that moment in time, Purcell told Davis if anything happened to Copeland, he would receive the death penalty.  Copeland had advanced from a co-defendant in the bank fraud case, to a cooperating informant, for which he was paid "immunity."

This is extremely significant, with after-discovered evidence in hand, exposing just how perverted Purcell really is, as he twisted the truth accusing Davis of masterminding the Callaway killing, when he was well aware that U.S. Attorney Rod J. Rosenstein made a deal with the real mastermind, attorney Larry J. Feldman. (id at #13,14)

Notwithstanding, it was there and then Paul D. Hazlehurst was introduced to Davis by Purcell. This was no casual introduction. Purcell indicated, in no uncertain terms,

TO

Hazlehurst would now be his counsel of record during all forthcoming legal proceedings.

Such behavioral pattern is illegal in several instances, not the least of which is by way of Hobson's Choice, which persists as a free choice in which only one option is offered.

Already proven to be a lying, deceiving prosecutor, conjoined with the presence of Rosenstein, the naïve, 25-year-old "black man" was now coerced to accept Hazlehurst as his counsel of record. Davis instantly objected, requesting he obtain the services of Ms. Flynn, who he argued was "up to speed" on his case, and he felt comfortable with her.

Collectively, Purcell and Hazlehurst argued she was unqualified, leaving the defenseless Davis with Hobson's Choice, Hazlehurst or nothing, take it or leave it. Hobson's Choice is often used to mean an illusion of choice. It is neither a choice between two equivalent options, nor is it a choice between two undesirable options, it persists as a choice between something or nothing. This occurrence in itself by Purcell with Hazlehurst in agreement, violated Davis's constitutional rights in denial of selecting counsel of choice.

At last look, defendants in this country still hold right to counsel of choice. Violation of this right are grounds for appeal and can compel reversal of a conviction. Purcell threatened Davis, insisting he had to employ Hazlehurst, noting with certitude he was clearly in collusion with the government, as part of the Feldman deal, to "railroad" this young black-man to 35-years in federal prison. This factual data was never introduced at the original legal proceeding, because of Hazlehurst's refusal to do so for obvious reasons, and the after-discovered evidence was suppressed by the government. For most of this nation's history, "the accused shall enjoy the right to have the assistance of counsel for his defense."

TO

The Supreme Court embellished that statement declaring a defendant has the right to counsel of his/her choosing. (Wheat v United States, 486 U.S., 153 – 1988). Denial of a choice of attorney, without good cause, should result in reversal of the defendant's conviction. (United States v Gonzalez-Lopez, 548, U.S., 140 – 2006).

It didn't take Davis long to figure out Hazlehurst was in collusion with the government. First, he informs Davis that the case against him was "the most well constructed capital murder case he had ever witnessed." Then, as expected, he ensued that discursive reasoning by giving Davis a second Hobson's Choice, work a "deal" with Purcell or else.

In that "deal", so long as he fully cooperates with the government by "turning against" co-defendants, Marfo and Boyd, he would net a sentence of 240 months in custodial detention. The petitioner cooperated to the fullest; his award in punishment for that compliance was 420 months.

Purcell added pressure by telling Davis, if at any time he stopped cooperating, the prosecution would make every attempt to secure the death penalty or life imprisonment for him.

This Honorable court is once again reminded Purcell offered all these allowances having suppressed affirmative evidence, in addition to knowing Davis was being "railroaded" to prison for 35-years because Rosenstein protected Feldman by defacing all his felonious conduct. (Exbt. "A", supra, at #23, #24).

With full due deference to this higher court, it is reminded, this lying, cheating prosecutor already knew Feldman was the mastermind of the killing and Davis was a mere go-between, yet he not only forces him to employ Hazlehurst, clearly in collusion with the government at this point, but he threatens Davis with the death sentence if he fails to cooperate. This in itself is illegal.

This was the pressure placed upon Davis as he was intimidated and pressured into signing an untenable and ludicrous one-sided plea agreement that secured him 35 years in prison for all the wrong reasons. Both Purcell and Hazlehurst are deserving of disbarment for their prejudicial, racial and expressed demeanor in this single judicial contest.

Significantly, now corroborated by after-discovered evidence, Davis informed Hazlehurst early-on that Feldman was the mastermind of this killing, indicating he was threatened and misled by the attorney to help him find a hitman to "off" Callaway. (id, supra, at #9)

Instead of investigating the matter or interviewing Feldman, the collusive-minded Hazlehurst discarded the information by telling Davis, "bringing-up such an allegation at this time would only upset Purcell and show him that Davis was not cooperating, not accepting his responsibility for his actions, and not to forget that death sentence he promised for any such action." Can anything be more diabolic and oppressive?

Hazlehurst's decision not to interview Feldman and not to introduce this as evidence in behalf of Davis, into the legal proceedings, was unreasonable, thereby satisfying the "Strickland Doctrine". Two conditions are necessary to show that a lawyer's representation was constitutionally substandard. First, his performance had to be outside the broad range of professionally acceptable assistance. Second, there must be a reasonable probability that, but for the attorney's unprofessional errors, the result of the proceeding would have been different.

One need not travel far to satisfy these two conditions in the instant action. Hazlehurst was forced upon Davis because he clearly was in collusion with Purcell, refusing to introduce Davis's statement that it was Feldman who masterminded the death of Callaway. Second, with the after-discovered evidence now available, the

result of this travesty of justice must be reversed. (Chambers v Armontrout, 885 F 2d 1318 – CA8-1989) (Strickland v Washington, 466, U.S. 668, 104, S. Ct., 2052 – 1984).

Further, why wasn't Copeland impeached by Hazlehurst to determine what he had to promise Purcell to get the immunity he was granted, even though in practice Copeland unknowing violated self-incrimination laws.

More importantly, Hazlehurst would have learned that Feldman called Copeland before calling Davis to advise him that law enforcement officials wanted to interview Callaway and it would be wise to eliminate him before that interview. Additionally, the pair determined it was best to contact Davis and get him to so proceed. Why was Copeland being protected by Feldman? Two reasons. First, he was supplying Feldman with prostitutes as was Davis, and second, he was involved in some of Feldman's other criminality.

Hazlehurst's failure to act in the aforementioned affirmed with certitude his incompetence which further solidifies his violation of the Strickland Doctrine.

### Deliberate Elicitation

The Fifth Amendment of the Constitution protects a person from being compelled to incriminate oneself. It can also be referred to as self-incrimination or self-inculpation.

This amendment admittedly protected Davis from incriminating himself in a crime when Michael Copeland, a friend and co-defendant in an alleged bank fraud scheme, turned himself into an instant informant to avoid punishment for his culpable behavior. The government thrives on the mentality of its informants.

Nonetheless, in this "trapsetting" scheme, the result must be declared inadmissible because self-incrimination persists as the act of exposing oneself, generally by

TO

making statements "to an accusation or charge of crime to involve oneself in a criminal prosecution or the danger thereof."

All the collected "data" Copeland provided the government, as to Davis's criminality must remain inadmissible, and was never previously argued as such by counsel of record, because, as now proven, counsel was illegally assigned to represent Davis.

Further, he was in collusion with prosecutor Purcell, who himself, along with U.S. Attorney, Rod J. Rosenstein, fabricated a story to protect Feldman and racially rail-road a 25-year-old black man to prison for 35 years.

Void any possible argument, America must scrutinize Rosenstein, who apparently has advanced far too high in the world of politics on deceit and foul play. (Exbt "A", supra at #31, #34).

How would this government solve any crimes if it didn't pressure weaklings like Michael Copeland into cooperating for absolution?

An informant is an informant. There can be no difference between jailhouse inform-ants and those accused of crimes who suddenly find "religion", when "facing prison residency", like Michael Copeland.

Case in point, the instant action. This higher court has already been introduced to after-discovered evidence that was not only suppressed by the government in this case, but a state of Maryland, U.S. Attorney, Rod J. Rosenstein, not only made a deal to protect a culpable attorney, but he had the FBI fabricate a story which netted a 25-year-old black man 35-years in federal prison, with no one looking back.

Somewhere "buried" in the "closet of justice" is the "deliberate elicitation" standard (Maine v Moulton, 474 U.S. 159, 176-77 – 1985). In the "Henry" court, after the de-fendant Billy Gail Henry was incarcerated, government agents befittingly contacted an imprisoned man by name, Edward Nichols, and told him to "pay close attention" to any statements made by Henry.

TD

Soon thereafter, the two conversed and Henry confided in his new found friend all about his bank robbery. Close at hand were government agents to intently listen thereafter to everything Nichols had to report. It was "incriminating" and of course Nichols was paid for his "labor", including his embellishments being pure bonus for government usage.

A few months later, the obliging Nichols testified at Henry's trial as it pertained to the incriminating evidence. Void any possible argument, Henry was convicted by the jury and ultimately sentenced to 25-years. Justice was served or so it seemed.

Contraire to that determination, however, Henry filed for habeas corpus relief alleging the admission of the testimony by Nichols was a constitutional violation of the Sixth Amendment, deprivation of right to counsel.

In appeal, the Fourth Circuit held, that by developing a relationship of confidence with Henry, to the point where Henry felt comfortable revealing incriminating information, Nichols and the government interfered with his constitutional rights.

The U.S. Supreme Court affirmed that decision. In fact SCOTUS held that by intentionally creating a situation likely to induce Henry to make incriminating statements without the assistance of counsel, the government violated his constitutional rights.

A fortiori, the court found that the government's use of Nichols as an informant to obtain statements from the defendant constituted "deliberate elicitation" of information as defined in "Massiah v United States, 377 U.S. 201, 84 S.Ct. 1199 – 1964).

The instant action mirrors this determination. Clearly, it applies just as strongly to indirect surreptitious methods of interrogation as it does to traditional overt methods of questioning.

SCOTUS made it quite clear "deliberate elicitation" could just as easily take place in a jail cell conversation, as it could during an all night police interrogation or be-

tween two alleged friends in a routine telephone conversation. (United States v Henry, 447 U.S. 264, S.Ct. No.79-121, June 16, 1980).

The "Henry" court went far in defining exactly what constitutes "deliberate elicitation". Nichols was paid for his information, just like Copeland was paid with immunity in the instant action to illegally get Davis to incriminate himself, with Copeland in violation of the Sixth Amendment under the Massiah Rule.

The Massiah Rule is very clear. It promotes the principle that "any attempt to elicit incriminating statements, not during a formal interrogation, from a formal interrogation...violates the Sixth Amendment." (Massiah v United States, 377 U.S. 201, 84 S. Ct. 1199 – 1964).

In further support, this Honorable higher court is introduced to "Kuhlman v Wilson, 477 U.S. 436, 458-59 – 1986".

The "Wilson" court made it clear, by deceiving an accused party into thinking that he or she is simply speaking to a friend or trustworthy party, the government has actively violated that defendant's Sixth Amendment constitutional rights. (See Wilson at 1437-38).

The instant action mirrors the reasoning in both "Henry" and "Wilson". First, all three cases involved paid government informants; second each case had the government taking affirmative steps to place the informants in close proximity to the accused parties; and third, and perhaps most importantly, in each case the informants had developed a close rapport with the accused.

Specifically, in "Henry" it is noted that, ". . .when the government knowingly and intentionally creates a situation in which it is likely that an accused party will make incriminating statements without counsel present, "deliberate elicitation" occurs.

TD

The government has affirmative obligation to respect the Sixth Amendment of the Constitution, and the use of an informant "middleman" to elicit information from the accused comes dangerously close to an abandonment of that obligation.

In the instant action, Copeland was assured of immunity for the information he gathered from his friend, Davis, under the standard of "deliberate elicitation".

These facts shed disinfecting light on a recurring problem that frequently knocks the justice system loose from its moorings and causes it to capsize.

## BY LEGAL MANIFESTATION THE VICTIM HEREIN WAS NOT A WITNESS.

The Final Judgment Order in the conviction of Tavon Dameon Davis reads in exactness as to Count 3s, "Conspiracy to Murder a Witness Resulting in Death", in violation of 18 USC {} 1512.

The legal definition of a witness is "someone who gives testimony under oath or affirmation (1) in person, (2) by oral or written disposition, or (3) by affidavit. (Black's Law Dic., Deluxe 11th Ed at 1919).

The victim in the instant action was 19-year-old Isaiah Cortez Callaway, killed by "hitman," Bruce Eric Boyd, with a firearm at close range as arranged by attorney Larry J. Feldman. In no way can it be misinterpreted, Boyd killed Callaway who at the time of the killing was a co-defendant in a bank fraud investigation, and admittedly not a witness of the government in any regard.

Law enforcement officials never interviewed Callaway, to get any statement of facts as to his involvement or anyone else's in the alleged bank fraud scheme, let alone made him a witness.

And while a person cannot refuse to testify if ordered to do so, the government never had an opportunity to so order Callaway to testify as a "witness". In fact, the government cannot even show Callaway would have been a qualified witness re-

23

TD

gardless. A qualified witness is someone who can lay the foundation by which a crime was committed. Callaway died before he could ever do that.

Thus, this count (3s) must be invalidated as the indictment is fatally defective as a matter of law. "An indictment is sufficient if it. . .contains the elements of the offense charged and informs a defendant of the charge against which he must defend." (Hamling v United States, 418 U.S., 87, 119 – 1974). Void any possible argument, this indictment (Count 3s) insufficiently states the wrong element (witness), which instantly brands the charge as "fatally defective".

### FINE LINE OF DISTINCTION SEPARATES WANT OF UNDERSTANDING AMONGST TERMS OF REFERENCE, "INTRASTATE" AND "INTERSTATE".

Count 1s of the petitioner's Final Judgment Order in conviction reads, "Conspiracy to Use Interstate Communication Facilities in the Commission of Murder-for-Hire", in violation of 18 USC {} 1958(a).

Once again this indictment is fatally defective because it incorrectly states the element of the crime, that being "use of "interstate". Admittedly, the government misuses the term, as all communication between the parties in the prescribed breach of law is "instrastate".

Had the government wanted to place the terms in tantamount, it should have charged the petitioner under The Travel Act, 18 U.S.C. {} 1952, not Section 1958, which indicates the government was well aware that the "intrastate" cellphone activity in the murder-for-hire scheme of Isaiah Cortez Callaway was not argumentative under "interstate" requirements.

Let us remain lucid, Section 1958(a), in relevant part, reads, ". . .whoever travels in interstate or foreign commerce. . .with intent that a murder be committed. . .shall be fined or imprisoned for not more than twenty years. . .and if death results, shall be punished by death or life imprisonment. . ."

Similarly, The Travel Act, a 1961 federal statute (18 U.S.C. {} 1952) also prohibits conduct intended to promote illegal business activities in "interstate" commerce.

While The Travel Act and 18 U.S.C. {} 1958 have been called "companion statutes" (United States v Marek 238 F. 3d 310, 326 – 5th Cir – 2001), they are nevertheless worded differently. There is a stark difference between the two pieces of legislation. Section 1958 appears as a "facility of interstate commerce", whereas The Travel Act uses the verbiage "facility in interstate commerce".

While some courts have dismissed this disparity as insignificant (United States v Nader, 542 F. 3d, 713, 716 – 9th Cir – 2008), others have placed great import on the nuance. (United States v Weathers, 169, F.3d, 336, 341 – 6th Cir – 1999).

This duplexity in meaning is reason enough to reject treating the "intrastate" use of an "interstate" facility in violation of Section 1958, as it has been accomplished in violation of The Travel Act.

Adjacent to even diffuse the translation, the government should have employed an alternative analytical basis. This is illustrated by the divergent conclusions courts have reached when determining whether an "all intrastate activity" is "interstate".

While the argument of "intrastate" versus "interstate" is more esoteric when the violation is attached to The Travel Act (Section 1952), in violation of Section 1958, as charged, the government never proved the "interstate" nexus.

Neither was it ever challenged, giving both those "credits" to the ineffective and collusive counsel of record, Paul D. Hazlehurst, the attorney of record foisted on Davis.

The argument of the petitioner in this regard is elementary. The cellphones branded by the government as "weapons" in communication were employed only in "intrastate" communication between the parties involved in this murder-for-hire plot.

All these calls were placed within the state of Maryland and there was no "interstate" element to give the federal government jurisdiction. (See Weathers at 339).

The prosecution never favored the search signal used in the cellphone calls between the parties which never approached state lines, let alone cross them. Therefore, the "interstate" requirement was never satisfied. No cell site location expert was ever called upon to present irrefutable evidence in supportability.

Accordingly, this "error" must invalidate Count 1s as the indictment persists as being "fatally defective". The Sixth Circuit held in "Weathers", that the language in Section 1958, "facility in interstate commerce" controls, and there needed to be actual "interstate" activity and that wholly "intrastate" actions would not suffice. (See Weathers 169, F.3d at 342). In furtherance of justice, Count 1s must be declared "fatally defective".

**Error Number Three:  District Court failed to ascribe to petitioner's "minor role" in this murder-for-hire conspiracy, yet persisted throughout the legal proceedings to make statements of suspicion that he was wrongfully accused, now validated with certitude pursuant to after-discovered evidence.**

While the petitioner recognizes a defendant is not eligible for a "minor role" participant reduction, by being a go-between rather than a principle in a conspiracy, (United States v McClinton, 135 F.3d, 1178, 1190 – 7th Cir. – 1998), he also recognizes it is warranted when the defendant is less culpable than other co-conspirators. (See United States v Brown, 136 F.3d, 1176, 1185-86 – 7th Cir – 1998).

In the instant action, Davis's "minor role" cannot be attached to conviction, it must be attached to the after-discovered evidence now visible before this court.

The court itself, now conjoined with after-discovered evidence, established Davis's minor role in this conspiracy, when with assurance it averred, "It is distressing that

TD

the one defendant who was the absolutely least responsible, even on the government's theory of the case, is the defendant who receives the maximum sentence. . . Mr. Davis is a man of demonstrated intelligence, demonstrated abilities. And, it's a tragedy that he's here. . ." (Snt. Tr. At 14, lines 13-19).

This was a murder-for-hire conspiracy The actors for this plot featured four (4) principal characters: (1) instigator/mastermind (Feldman); (2) the go-between (Davis); (3) the "hitman" (Byrd); (4) and the victim (Callaway).

While murder-for-hire stories, in terms of the characters, have a somewhat common anatomy, they differ widely according to the socio-economic status of the participants, the nature of their relationships to each other, and the specific motive behind the killing.

Feldman was a seasoned attorney (18 years), older and much wiser than the three "kids" who completed the cast of characters. This was his "show". His motive was openly defined, he wanted to rid himself of both Davis and Callaway (Exbt. "A" at #13, #14 and #27).

Feldman is not a "murder doer", he breathes as a "murder plotter", and while certainly sociopathic, desperate and involved in numerous criminal offenses (id at #10), when discovered by the government of his breaches of law, he was compelled to do as he was told, to avoid spending a considerable amount of time in prison. (id at #20).

Feldman, the "plotter", had the perfect go-between to carry out the killing of the 19-year-old Callaway, that being Tavon Dameon Davis. This course of reasoning would put him out of direct "line of fire". Admittedly, Feldman underestimated the reach of conspiracy law, as well as the incriminating power of motive. This labor under a misapprehension was his undoing, much like the blunder he made in making his "deal" with the government to cooperate. (id at #24, #25).

## MENS REA AND ACTUS REUS

In a "murder-for-hire" plot, there are only two essential elements of the crime, those being mens rea and actus reus. Mens rea can also be described as the mental element, the criminal intent, the guilty mind, all in this instance describing attorney Larry J. Feldman.

Mens rea is synonymous with a person's blameworthiness to merit the condemnation of criminal conviction. It describes the state-of-mind that, together with its accompanying conduct (actus reus), criminal law defines as an offense.

The meaning of both mens rea and culpability must often be determined from their context. (Paul H, Robinson, "Mens Rea", Encyclopedia of Crime & Justice, 995-996 – Joshua Dressler ed., 2d ed – 2002).

When Feldman was contacted by law enforcement officials that they wanted to interview his client, Callaway, about his involvement in the check bank fraud allegations against him, he seized the opportunity, knowing Copeland and Davis were also involved.

First he called Copeland, who in addition to providing him with prostitutes, was seemingly also involved in some of his other criminal activities. Then, after discussing the situation, the pair decided it would be best to contact Davis, which Feldman did instantly.

At best, the culpability attached to the bank fraud offense would have netted the participants no more than four years in prison, if convicted. Instead, Feldman advised Davis he and the others would get no less than 20 years, and it was in the best interest of all, to "off" Callaway before he is interviewed and can incriminate everyone. A fortiori, the element of mens rea in this murder-for-hire plot belongs singularly to Feldman. (id, supra, #27).

The second essential element of this criminality is actus reus, the physical component. It persists as the "deed of crime". When combined, mens rea and actus reus establish the criminal liability.

In the case at bar, attorney Feldman masterminded this murder-for-hire plot to rid himself of not one, but two agitators, that he considered a nuisance and expendable, that being Callaway and Davis. (id, supra, #13, #14).

When Feldman convinced the scared Davis that he and his associates were going to prison for no less than 20 years, because Callaway planned to incriminate them all when interviewed, nothing anywhere on the record confirms Callaway was going to incriminate anyone.

It was at this moment in time, as the "go-between", Davis alerted his three associates (Copeland, Marfo and Boyd), as to what Feldman advised, being unaware Feldman had already confided in Copeland, who as this court now knows, turned informant to be rewarded with immunity.

From that point forward, Marfo took control, made a deal with Byrd, paid him $2,000, in return he would "trigger" Callaway. And that was the role enacted by Davis, as the go-between. The primary actors in this murder-for-hire plot, and there can only be two, Feldman with the mens rea and Byrd with the actus reus.

Davis's role was that of "minor" participation, as he was admittedly not an essential element of the official misconduct, as it pertains to the portrayal as a matter of law.

"Deed of crime" does not indicate the crime itself, but is merely the ingredient of the offense. While actus reus is essential, it is not sufficient without the necessary mens rea, just as mens rea is insufficient without the necessary actus reus (Rollin M. Perkins & Ronald N. Boyce, criminal Law, 831, 3d ed – 1982).

In the instant action, it can be no clearer, Feldman masterminded (mens rea) the killing of Isaiah Cortz Callaway, with the actus reus being perform ed by Bruce Eric

Byrd,. The role of Davis was minor, no different than that of a "mule" in a drug case, therefore he holds entitlement to downward departure, as re-sentencing must occur, further affirmed by after-discovered evidence. (id, supra, at #29).

**Error Number Four: District Court erred when it accepted the discriminatory terms of a plea agreement, so one-sided it looms as an imaginative faculty with the declaratory demeanor of substantial cooperation going unrewarded.**

Reminding the court, legal representation by attorney Paul D. Hazlehurst for the petitioner was forced upon him by the already proven to be dishonest prosecutor, John Francis Purcell, Jr., with prejudicial and racial intimation.

This assignment of assistance was wholly illegal. Deductible by the dichotomy herein, it is impalpable to justify how any defense attorney, in the best interest of his client, could even suggest he or she plead guilty to Counts 1s and 3s as written.

Oftentimes, short-cuts to justice, by way of these lopsided plea agreements, are regrettably saturated with lies and deceit, two "qualities" already fixed to be part and parcel of the modus operandi of prosecutor Purcell. His conduct in this miscarriage of justice is truly worthy of being punishable by law, along with his superior, Rod J. Rosenstein, who dared to "make a deal" with an attorney, behind-the-scenes, to racially "railroad" a young black man to prison for 35 years. Both these hypocrites hold no credibility as they have violated Davis's constitutional rights and their own code of professional conduct.

At the sentencing hearing of Davis, prosecutor Purcell performed brilliantly as an over-zealous, perfidious minister of justice in the employ of the Department of Justice.

He pretends, with great theatrical performance, to downplay the substantial cooperation Davis provided, noting his life to this date, remains at risk for that cooperation.

Throughout the hearing, this robotic prosecutor directed his attack at Davis, knowing full-well, he and Rosenstein were fully aware Feldman masterminded this killing as evidenced in Exhibits A and B.

Both of these government attorneys never realized, their deceit would one day surface by the actions of a "good samaritan", with after-discovered evidence now in finality bringing this racial disguise for all these years to a screeching halt in reversal.

It's jocular, that this "masked prosecutor", fully knowledgeable of the "deal" Rosenstein made with Feldman, continued his charade throughout the legal proceedings, making statements of shielded credibility like, "I mean if we had gone to trial, we would have had consecutive sentences imposed. Things like that". (Snt Tr at 5, lines 20-25).

The days of lying and deception are over for Purcell, who will be stripped of any "false immunity" claims when civil action against him becomes a reality. The court is reminded not to forget the fact Davis appeared at the trial of Frank Marfo, as a witness for the prosecution as part of his substantial cooperation.

What does he get for that "risk of his life", still breathing to be sure, 35-years of imprisonment. With after-discovered evidence now in appearance, proving beyond any reasonable doubt, he was racially overwhelmed by two corrupt government attorneys, Rod J. Rosenstein and John Francis Purcell, Jr.

Now in hindsight, with evidence in hand, that was initially suppressed by the prosecution during initial legal proceedings, this court is referred to Purcell's polluted statement at the sentencing hearing, ". . .the defendant and the government have agreed to a particular sentence, that being 35 years."

With that utterance, he then has the audacity to opine, "...if the sentence would be 365 months, the government would argue it would be too low. We would ask for an upward departure." How can anything be more racially disgusting?

With this higher court now fully briefed, with after-discovered evidence, the lucidity of the corruption displayed by Rosenstein and Purcell is apparent. This entire legal matter is beyond comprehension.

At sentencing, Judge Grabis selected his words very carefully "I think there is a strong policy in favor of a court finding that a plea agreement is reasonable. And that it would be more than just saying not exactly what I think should happen, therefore, I will impose the sentence that's called for in the plea agreement, so the sentence is 420 months. . .supervised release will be five years. . ." (id at 14-15, lines 25, 1-8).

At one point in the sentencing hearing, Judge Grabis displayed his appreciation of what he inferred, there had to be "more to this story". He actually verbally chastised Feldman for betraying his client (Callaway) by informing Davis that law enforcement officials wanted to interview Callaway about the bank check fraud scheme Marfo, Byrd, Davis, Copeland and Callaway allegedly operated in tandem.

It was when Judge Garbis admittedly stated, ". . .I do believe Mr. Davis, when he said 'that if he realized it would have been a three or four year sentence for the bank fraud breach of law, Callaway would never have been killed. With the after-discovered evidence now in place, the entire blame for masterminding this successful murder-for-hire plot befalls on Feldman (See Exbt. "A", at #27, #29).

Judge Garbis concluded his brief opinionated analysis, at that moment in time, not realizing he was "right on target".

If Hazlehurst accomplished anything of consequence, it was when he reminded Judge Grabis that due to Davis's substantial cooperation against Frank Marfo and

TO

"hitman", Bruce Eric Byrd, his life was forever more at risk, and during incarceration, at all cost, he must never be in residence at the same prison facility with either of the pair. (id at 16, lines 17-23).

It's this narrative exchange between the court and Hazlehurst that contradicts the 35-year sentence imposed on Davis, even before after-discovered evidence in pre-sentment.

Never once did the collusive Hazlehurst bring to the forefront the insignificant credit Davis received for the substantial cooperation he provided to Purcell, noting this included telling Hazlehurst that it was Feldman who masterminded and structured his wanton death of Callaway. Neither did the colluding Hazlehurst ever again bring to the forefront his guarantee to Davis, that if he cooperated with Purcell, he would be "rewarded" with 240 months imprisonment. This, however, was ignored, with the rest of the story now before this higher tribunal, absent any possible argument in rebut.

This "opinion" by Judge Grabis was extended in added revelation at the closing of the sentencing hearing, "Now that you mention it Mr. Hazlehurst, I'm going to add. . . that he (Davis) will cooperate fully and truthfully. . .in the investigation by bar counsel or by investigators appointed by this court to investigate the actions of Larry Feldman, Esquire." (id at 18, lines 16-22).

This spontaneous comment by Judge Grabis, at that moment in time, held little impact on the proceedings. . .until now, as Exhibit A and B expose Larry Feldman, Esquire, for what he is and what his role was in this travesty of justice, resulting in a death with far too much culpability placed on the wrong individual, Tavon Dameon Davis.

With certitude, prosecutor Purcell made certain the sentencing transcript remained "sealed", clearly to avoid any possible public review. Deductible by the truth now in finality, this plea agreement must be declared invalid.

TO

Counts 1s and 3s are "fatally defective" as demonstrated herein; Davis's self-incrimination to an informant was inadmissible, as demonstrated herein; Callaway, the victim was killed not as a witness but as a challenged co-defendant as demonstrated herein; and there occurred no "interstate" facilities communication, as demonstrated herein.

## Conclusion

The after-discovered evidence herein, protected by its presence (Exbt. "A" & "B"), discloses by any reasonable doubt, government abuse of public trust decided this judicial contest.

First, the prosecution forces legal representation upon the petitioner in the form of attorney Paul D. Hazlehurst, arguably in collusion with the government during this charade of justice. Next, we have a U.S. Attorney for the District of Maryland, Rod J. Rosenstein making illegal undisclosed deals with attorney Feldman, to protect him from prosecution in this case and other criminality. Then we have prosecutor Purcell, the worst of the lot, covering-up Rosenstein's felonious conduct by suppressing that factual data now exposed in Exhibit "A", as Purcell then gives the false appearance of being a legitimate prosecutor during the remainder of the legal proceedings.

This case must be re-opened , first, by vacating the Final Judgment Order filed on December 4, 2012. The resentencing of Davis is warranted as it persists as an unreasonable application of all the facts now visible in the case at bar.

While it has already been established, this matter of judgment started in 2011, is a complete travesty of justice with severe racial overtones and maladministration from a United States Attorney, no less with significant notoriety.

Giving Judge Grabis a certain amount of latitude, he was never fully briefed, yet was able to sense there was much more to this murder-for-hire plot than was revealed by the government. For this, Judge Grabis must be commended.

The real culprits here are Rosenstein and Purcell, who saw fit to "closet justice" to protect a pettifogger of an attorney (Feldman), who himself, must now face the consequences along with his "temporary benefactors," Rosenstein and Purcell. (Williams v Taylor, 529, U.S. 362, 413 – 2000).

Notwithstanding, this higher court surely cannot be so deludable to think Rosenstein and Purcell haven't done all this before, they just never got caught, or if they did, that too was suppressed. In observation, this case truly illustrates to perfection how justice in this country breathes. . .through its mouth.

In full satisfaction of grounds heretofore, sufficient for a mistrial, the petitioner, with after-discovered evidence, acknowledges in specificity the presence of significant errors of law; a final judgment going against the weight of the evidence; irregularity in court proceedings, central to "prosecutorial misconduct"; and unreasonable punishment still in place.

Notwithstanding, Davis, in the best interest for the government, will waive these considerations, in lieu of resentencing to time served.

The affidavit/declaration of Daniel Scott, an alien to the details of this litigation, shows what can happen when the foul play of government ministers of justice cross that threshold of doing what they are paid to do and playing "god".

Had all this exculpatory evidence, suppressed by Purcell, been available at the initial legal proceedings, in all probability it is sufficient to undermine confidence in a totally different outcome, especially in the sentencing of the 25-year-old, African-American, Tavon Dameon Davis.

TO

It persists as consequential evidence that existed at the time of the initial legal proceedings but never materialized because of "prosecutorial misconduct".

In closing, the petitioner prays this "place where justice is truly administered" will not be swayed by the political positions of the culpable in this case at bar, and act swiftly with its authoritative discretionary powers to right this "racial" wrong, by vacating this conviction, remanding the case for re-sentencing to time-served, releasing the victimized, Tavon Dameon Davis expeditiously, and pursuing proper legal action against Rod J. Rosenstein, John Francis Purcell, Jr. and Larry J. Feldman for premeditated disregard of the legal code with racial discrimination unnecessarily aimless in a criminal case obstructed by the appropriation of law, openly violated by the trio so named above.

Discretion by this court consists of knowing through the law what is just, and then acting, regardless of who must pay the price for foul play and injustice.

RESPECTFULLY submitted on this___2nd___day of _December_ 2020, by

MR. TAVON DAMEON DAVIS (#54006-037)

Federal Correctional Institution McKean

P.O. Box 8000

Bradford, PA 16701

# EXHIBIT A

# UNSWORN DECLARATION ALLOWED
# UNDER STATE AND FEDERAL LAW

**STATEMENT OF FACT:** Sole purpose of this Declaration, under penalty of perjury, is to confirm several conversations that took place between the deponent, DAN SCOTT and attorney LARRY J. FELDMAN, licensed to practice law in the state of Maryland.

In specificity, this interchange of information directly affects the criminal conviction of 32-year-old, TAVON DAMEON DAVIS, now serving a 35-year sentence in federal prison, pursuant to Case Number 1:11-cr-00657-MJG-1, U.S. District Court, District of Maryland.

IN ACCORDANCE with the provisions of Section 1746 of Title 28, United States Code, I, the undersigned DAN SCOTT, do hereby make the following Declaration pertinent to the above-styled cause of action:

1. I am over the age of 21 and in sound mind. I have personal knowledge of the statements in fact that follow. Currently, I am a resident of Jessup, Maryland.

2. I am in no way related or acquainted with Tavon Dameon Davis, and only step forward at this moment in time in appreciation of seeing justice legitimized.

3. In July 2015, I began attending Sex Addicts Anonymous (SAA). As a fellow-ship of recovering addicts, SAA offers a message of hope to anyone who suffers from sex addiction. The basic principles of recovery practiced by SAA are found in its "12 Steps Program".

4. It was there I met and was befriended by attorney, Larry Feldman, who had been actively engaged in SAA a short time prior to my arrival.

5. Presumably, believing it would be beneficial to him as part of the "12 Steps Program", early-on he "opened-up" to me with events from his past that were clearly troublesome. I know of no reason why he selected me in partic-ular. However, being compassionate, I encouraged his willingness and hon-esty. Admittedly, it made him feel better.

6. Outward appearance profiled him as a successful but unsettled attorney who squandered his career due to his ardent impulse for prostitutes. He ex-changed his legal services for sex; and this led to his suspension from the Maryland Bar Association.

7. He was openly bitter toward one Tavon Davis, who provided him these pros-titutes in exchange for reduced and sometimes free legal services for his friends.

8. One such friend was 19-year-old Isaiah Callaway, who according to public record was killed as a witness at the order of Tavon Davis. My conversations with Mr. Feldman, however, contradict this conviction as Mr. Feldman and Maryland Attorney General Rod Rubenstein conspired to railroad Mr. Davis and his associates into prison beyond any doubt.

9. For reasons never made clear to me, Mr. Feldman persisted in giving me details of the killing of Mr. Callaway that he personally was instrumental in organizing his death.

10. Additionally, he confided in me that his criminality in the second half of 2015 was far more dreadful than mere prostitution, all of which was apparently covered-up by the government, as it was more interested in "railroading" Tavon Davis and his associates to prison for elongated periods of time. To me, it had racial overtones.

11. Somehow Mr. Feldman was of the opinion I would be fully aware of his legal problems by way of public information, and for reasons still unclear, he used me as his "confessional".

12. In truth, I knew nothing about his criminal activities and really had no interest in learning about them. Nonetheless, he continued to confess to some serious degenerate and felonious actions that repulsed me.

13. This included his arrangement of the killing of his client, 19-year-old Isaiah Callaway, coercing Mr. Davis' involvement, out of spite and bitterness.

14. In the words of Mr. Feldman, ". . . he conned Davis' black ass into offing Callaway, to get him (Davis) out of his hair."

15. In almost a fanatical tone, he repeatedly complained that the "whores" Davis provided were "no where near the price he was paying. . .". His bitterness was all too obvious, he was being taken advantage of and his legal services held a far higher monetary value than the "cheap hookers" being provided by Davis.

16. He expressed satisfaction in knowing Davis would be spending most of the rest of his life in prison, for something he himself was instrumental in organizing.

17. Seemingly, when law enforcement contacted him, as the attorney of record for Callaway, informing him that they wanted to speak with his client, he used that as the course of reasoning to tell (illegally) Davis about the request, advising him that Callaway would "rat" on him and his associates, and for him to avoid a long prison term, his only hope was to eliminate Callaway.

18. With that, Mr. Feldman boasted repeatedly how his plan worked and he ridded himself of both Davis and Callaway.

19. Clearly, he had participated in several of the conversations relevant to how this killing would occur. He was upset with himself because he miscalculated his insulation attempt at keeping his role invisible. Law enforcement became aware of those conversations and other communication, and according to Feldman they did so illegally, creating a "work around" after the fact to make illegal surveillance and spying appear authorized.

20. Also, law enforcement managed to discover him with some of Davis' supplied prostitutes and seized the opportunity to leverage that information into having him cooperate. If he didn't, he would also be charged with soliciting murder-for-hire, and organizing the death of Callaway.

21. On the other hand, he talked about believing he could beat such a charge legally and could get certain evidence suppressed because it was illegally obtained.

22. He spoke further about having decisions to make, like being disbarred, like being able to get the charges against Davis dismissed, and about fully cooperating with the government, whose only interest was in getting Davis and his associates "off the streets" and in prison for the rest of their lives.

23. It was then he told me, he made a deal with Maryland Attorney General, Rod Rosenstein. This further repulsed me knowing this is how justice in this country operates.

24. It was agreed law enforcement, including the FBI, would concoct a fabricated story noting that Feldman was a cooperating witness in lieu of the truth, which was Feldman organized this killing.

25. Feldman says he insisted the government affirm its commitment to him publicly, as he was familiar with how the justice department reneges on its "deals". It "indicated" it would do so, and Feldman proceeded.

26. Rosenstein conspired with local law enforcement, including the FBI, to "hide" the evidence implicating Feldman as the organizer in this killing. Apparently, part of the deal was he had to "cough up" (his words) a significant monetary settlement to the Callaway family.

27. To paraphrase two disgusting statements he made to me, I repeat, "Davis and all those black gangbangers will probably end up dead before they get any older" and "Callaway's mom has more money now with her worthless kid dead than she ever would have seen if I hadn't gotten him killed."

28. As agitated and disturbed all his confessions made me, I didn't want to hinder his progress in the "12 Steps Program" of SAA, as I find the program extremely beneficial.

29. Feldman actually was instrumental in the death of a 19-year-old, and with the help of a deceiving state attorney general, still walks the streets free, while Davis in particular is serving a 35 year sentence.

30. After hearing Feldman's statements of fact, I was still somewhat confused as to why he enrolled in SAA even though he had this prostitution issue. It was then he told me the government reneged on the deal, with the FBI refusing to publicly affirm it lied in court where it stated he was a "doofus" instead of the organizer of the murder.

31. The obvious fear of the government was this could mitigate the sentences eventually imposed on Davis and his associates. Instead, the FBI or the prosecutors in this case, influenced the Maryland Attorney Grievance Commission to formalize a complaint against Feldman, being certain to insulate Rosenstein and the FBI from any wrongdoing.

32. So instead of being disbarred, Feldman was branded as incompetent not malicious. His license was suspended for prostitution issues, and he was therefore attending SAA to obtain reference letters from members to show how repentant and rehabilitated he became so he could activate his license

to once again practice law in the state of Maryland. After several denials, he was eventually reinstated.

33. Ironically, I personally never wrote a letter of reference for him, while other members did, not being privy to all the facts, as I was. I still find what he did deplorable and hopefully the factual data I present herein will mandate that Mr. Davis, who was wrongfully convicted and sentenced, will obtain appropriate relief from his sentence.

34. As for Feldman and Rosenstein, and other unnamed law enforcement officials, they should all be severely reprimanded for their deception in this complete miscarriage of justice.

35. I was ready to disclose this information in 2015. I went to my own attorney, told him the story, and he ill-advised me that information disclosed at a SAA meeting cannot be used as evidence. I found out later he was wrong. Plus, it was clear, he had no interest in attacking Feldman, a fellow attorney.

36. It was in 2019 that I learned that the information I received from Mr. Feldman in conversations, impacting a murder case, can certainly be used in evidence.

37. I remained personally distraught in knowing what I did know about this killing, feeling a moral obligation to set the record straight on this injustice. In March of 2020 I contacted the attorney for the Callaway family to explain the situation. He checked with the family and informed me, they were perfectly happy with the civil monetary settlement and had no interest in getting further involved in any legal actions.

38. It was then I contacted the wife of Tavon Davis. The result of the telephone call is this declaration.

I DECLARE, under penalty of perjury, under the laws of Maryland, that the foregoing is true and correct.

SIGNED on this ___26___ day of _October_ 2020 at ___8:00 a.m.___.

_Dan Scott_
PRINTED NAME

SIGNATURE

Mr. Dan Scott

7785 Rte. 175

Jessup, Maryland 20794

# EXHIBIT B

DAN SCOTT
C/O Inmate Aid, LLC
6803 Lake Worth Road
Lake Worth FL 33467

Tavon Davis - Inmate 54006-037
FCI-McKean-Camp
PO Box 8000
Bradford PA 16701

Mr. Davis,

I have exculpatory information for your case involving your buddy Larry Feldman. The police aren't taking my complaint because they don't want to help a convict, but I can't, in good conscience, let you rot in jail when the police are covering up evidence that might--MIGHT-- reduce your sentence or release you.

Please send me the name of your lawyer(s) involved in your original case. I will contact them and find out how to get this evidence filed. Or, if you can contact them, give them my number below and have them call me. I've already spoken to the attorney of the family of the Calloway boy that received a substantial sum in suing Mr. Feldman, so they aren't interested in getting any more money in another lawsuit.

I'm not happy about helping you. But I believe in the rule of law, and you could have had a better result if not for the police and prosecutorial misconduct that took place.

Dan Scott
7785 Route 175, Suite 106
Jessup, Maryland 20794
443-676-3304

## CERTIFICATE OF CONCURRENCE

THIS IS TO CERTIFY that I have this day served the following participants in the case at bar with a true and correct copy of the foregoing document depositing a copy in the United States mail in a properly addressed envelope with adequate postage affixed thereto to ensure delivery.

Court Clerk
U.S. Court of Appeals
For the Fourth Circuit
Lewis F. Powell, Jr. Courthouse & Annex
1100 E. Main Street (#501)
Richmond, VA 23219

John F. Purcell, Jr., Esq.
Office of U.S. Attorney
36 S. Charles Street (Fourth Flr)
Baltimore, MD 21201

Honorable Marvin J. Garbis
U.S. District Judge
U.S. District Court
District of Maryland
101 W. Lombard Street
Baltimore, MD 21201

_____ (Inmate Signature)

MR. TAVON DAMEON DAVIS (#54006-037)
FCI McKEAN
P.O. Box 8000
Bradford, PA 16701

Dated this____2nd____day of___December___2020

Document Title(s) Enclosed:    MOTION FOR LEAVE TO FILE PETITION
FOR EXTRAORDINARY WRIT OF ERROR
APPARENT UPON FACE OF THE RECORD
WITH AFTER-DISCOVERED EVIDENCE
IN AFFIRMATION



UNITED STATES POSTAGE

02 1P
0001126400
MAILED FROM ZIP

Court Clerk, U.S. Court of Appeals
For the Fourth Circuit
Lewis F. Powell, Jr, Courthouse & Annex
1100 E. Main Street (#501)
Richmond, VA 23219



#54006-037|
FCI McKean
P.O. Box 8000
Bradford, PA 16701

CERTIFIED MAIL®

7018 0680 0001 1418 2478

7018 0680 0001 1418 2478

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS, FOLD AT DOTTED LINE